IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JEFF NORTH,

Defendant.

CRIMINAL CASE NO.

1:16-CR-00309-WSD-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are Defendant Jeff North's motion [Doc. 20] to suppress physical evidence, that is, the warrantless seizure of a firearm from a vehicle that he was operating on March 23, 2015, and motion [Doc. 21] to suppress a statement he made on that date. An evidentiary hearing, taking place over two days, January 12, 2017 [Doc. 60] and May 18, 2017 [Doc. 57],[1] was held on the motions to suppress evidence and statements. Defendant contends that he had a reasonable expectation of privacy in the vehicle, a black van, he was operating at the time he was stopped and detained and when the vehicle was searched; that the officer lacked reasonable suspicion for the stop and detention; that the warrantless search of the vehicle was

_____

[1]Citations to the transcript for the January 12, 2017, hearing are cited as: (Tr. 1/12/17 at ). Citations to the transcript for May 18, 2017, hearing are cited as: (Tr. 5/18/17 at ).

unlawful; and that the statement he made to the officer is not admissible, either constituting fruit of the allegedly illegal stop and detention or having been made before he was advised of his <u>Miranda</u> rights.  [Doc. 61].  The Government opposes the motions to suppress contending, primarily, that Defendant lacked a reasonable expectation of privacy in the vehicle which he had just stolen and that, even if he can challenge the stop and search, the officer had reasonable suspicion for the stop and detention, that the search was lawful as incident to Defendant's arrest or under the automobile exception and that Defendant's statement was non-custodial and was not made in response to interrogation.  [Doc. 62].

After consideration of the evidence presented at the hearing on Defendant's motions and of the arguments made by the parties, the court finds that Defendant lacked a reasonable expectation of privacy in the vehicle, the black van, that he had just stolen from Johnny Dansby, the vehicle's owner.  Even if Defendant could challenge the stop and his detention and vehicle search, the officer - based on the report of the carjacking by Mr. Dansby, who was bleeding at the time from the gunshot wound inflicted by Defendant - had reasonable suspicion to conduct the vehicle stop and to detain Defendant and had probable cause to conduct a warrantless search of the vehicle for the firearm used in the carjacking.  Additionally, Defendant's statement to

2

the officer was not made while he was in custody and, further, was spontaneous and voluntary and not in response to interrogation. For these reasons, the court recommends that Defendant's motions to suppress be denied.

## I. Background Facts[2]

On March 22, 2015,[3] sometime in the afternoon or early evening, Johnny Dansby traveled to a Valero gas station on Hollowell Parkway, in the Atlanta area, for the purpose of selling a van that he had recently purchased.[4] (Tr. 5/18/17 at 9-13; Def.

---

[2]Although Defendant includes a summary of the legal authority governing a court's witness credibility determinations [Doc. 61 at 7], Defendant does not apply that authority to challenge the credibility of the witnesses testifying at the evidentiary hearing [Doc. 61]. The court considered the factors weighing on witness credibility, including, demeanor and appearance, consistency or lack thereof, background, motive and interests, and, for the purpose of deciding the motions to suppress, finds the following facts reliably established by the record. See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses[,]" and, unless "'contrary to the laws of nature, or . . . so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact.) (citation omitted).

[3]Based on the totality of the events related at the evidentiary hearing, the court concludes that the encounter ultimately resulting in the carjacking on March 23, 2015, at approximately 3:00 a.m., began the afternoon before, that is, March 22, 2015.

[4]Dansby testified that he had recently purchased the van from the widow of the vehicle's owner and had in his possession at the time the title to the van but not the

3

Exh. 5).  At the gas station, he met Defendant North who was interested in buying the

van; however, Defendant did not have sufficient cash with him.  (Tr. 5/18/17 at 13-15).

Defendant only had $700, and Dansby would not accept less than $1,200.  (Tr. 5/18/17

at 14-15).  Defendant made some calls to see if he could obtain the remaining cash and

advised Dansby that his uncle would provide the funds.  (Tr. 5/18/17 at 14-15).  The

men remained at the gas station for about one hour.  (Tr. 5/18/17 at 13).  Defendant

asked Dansby to drive to his uncle's, and Dansby drove the men, in the van, to a "little

bunkhouse thing"[5] following Defendant's directions.  (Tr. 5/18/17 at 14-15).

    Although he and Dansby remained at the "bunkhouse" for two to three hours,

Defendant was unable to obtain the rest of the funds needed to buy the van.[6]  (Tr.

---

power of attorney ("affidavit") authorizing the widow to sell the van to him.  (Tr. 5/18/17 at 12, 24).  He apparently, purposefully, left the affidavit at his home.  Because Dansby intended to sell the van, he had not registered the title in his name.  (Tr. at 24-26).

    [5]Dansby described the "bunkhouse" as a place where rooms are rented.  (Tr. 5/18/17 at 15).  This location was not Defendant's uncle's residence.  (Tr. 5/18/17 at 19-21).

    [6]In an effort to keep Dansby, who was becoming "antsy," entertained, Defendant provided a female, named Kim, to pacify Dansby, that is, perform oral sex, and he provided about $40 worth of drugs to Dansby.  (Tr. 5/18/17 at 17-19).  According to Dansby, everyone in the "bunkhouse" was using drugs.  (Tr. 5/18/17 at 18-19).  When later speaking to police investigators at Grady Hospital, Dansby did not relate the events at the "bunkhouse."  (Tr. 5/18/17 at 31-33, 40-41).

4

5/18/17 at 16-19). Defendant then advised that it was time to leave. (Tr. 5/18/17 at 19). When the men exited the "bunkhouse," Defendant went over to an old car and "did something" - Dansby guessed that Defendant obtained the firearm he later used from the vehicle. (Tr. 5/18/17 at 19). Defendant asked if he could test drive Dansby's van to his uncle's, and because Dansby believed Defendant was going to buy the van, he allowed Defendant to drive the van. (Tr. 5/18/17 at 20-22).

Defendant drove, with Dansby in the passenger seat, to an apartment complex that appeared to Dansby to be mostly abandoned, with many of the apartment windows boarded up. (Tr. 5/18/17 at 21-22; Def. Exh. 7). When they arrived, Defendant exited the van and entered one of the apartments. (Tr. 5/18/17 at 22, 26). He returned to and entered the van to advise Defendant that a guy wanted Dansby to come inside for the money. (Tr. 5/18/17 at 22, 28; Def. Exh. 9). Dansby responded, "No, I'm not going there . . . [J]ust give me my damn keys . . . ." (Tr. 5/18/17 at 22, 26-27). Defendant did not return the van's keys; instead, he said, "[G]ive me your wallet."[7] He repeated the demand. (Tr. 5/18/17 at 22, 26). Defendant then pulled a firearm and said, "Now get out the van." (Tr. 5/18/17 at 22, 27).

---

[7]Dansby believed that Defendant wanted the wallet because he had seen Dansby place the van's title in it. (Tr. 5/18/17 at 22, 25-26).

5

Dansby tried to reason with Defendant explaining that Defendant did not have the power of attorney which Dansby believed Defendant needed. (Tr. 5/18/17 at 22, 24-26). Defendant responded that he "don't give a fuck about you and just shot [Dansby]." (Tr. 5/18/17 at 22, 28). Dansby exited the vehicle and circled around the front of the van to avoid being shot again when Defendant, aiming out the passenger window, fired another shot at him. (Tr. 5/18/17 at 22-23, 28). Dansby ran, ducking behind vehicles, to the exit of the apartment complex with Defendant following in the van trying to get another shot at Dansby. (Tr. 5/18/17 at 23, 29-30). At the top of the street, Defendant stopped for a red light before turning right onto Joseph E. Boone ("JEB"). (Tr. 5/18/17 at 30).

At this time, approximately 3:00 a.m., on March 23, 2015, Atlanta Police Officer Willie Williams was traveling westbound on JEB and observed a black van turning off of Archer Way and right (westbound) onto JEB.[8] (Tr. 1/12/17 at 5-7, 15). He simultaneously observed a male, in a bloody white tee shirt, waving at him. (Tr. 1/12/17 at 7, 15; Tr. 5/18/17 at 23, 30). The male, Dansby, advised that his vehicle had been taken, and he pointed out the black van that Officer Williams had just observed.

_____

[8]Officer Williams, who had been a patrol officer for three and one-half years, was in uniform and operating a marked patrol vehicle. (Tr. 1/12/17 at 4-5).

AO 72A
(Rev.8/82)

(Tr. 1/12/17 at 7). Dansby advised, "[T]hat's my van traveling down JEB now, and the person who shot me is inside that van." (Tr. 1/12/17 at 7, 16-17). The van was about one thousand feet away, and no other vehicles were on the road. (Tr. 1/12/17 at 7-8). After contacting dispatch and requesting Grady EMS for Dansby, the officer followed the van activating his blue lights and siren. (Tr. 1/12/17 at 8, 17-18; Tr. 5/18/17 at 31).

The van stopped at 1218 JEB, approximately one-quarter mile from the intersection at Archer Way. (Tr. 1/12/17 at 8, 18). As Officer Williams exited the patrol vehicle, Defendant opened the door and began exiting the van. Due to the dangerous circumstances, the officer had his weapon drawn and at low ready, that is, pointed at the ground. The weapon was not pointed at Defendant. (Tr. 1/12/17 at 8-9, 19, 21). The officer directed Defendant to exit the van and to lie on the ground. (Tr. 1/12/17 at 9, 19-20; Tr. 5/18/17 at 3-4, 6). Defendant responded aggressively, stating, "What the fuck did you pull me over for? I did not do anything."[9] (Tr. 1/12/17 at 9, 19). The officer repeated his instruction to exit the vehicle and to lie on the ground; Defendant complied. (Tr. 1/12/17 at 9, 20; Tr. 5/18/17 at 6). Officer Williams secured Defendant and advised him that he was being detained as a suspect in a crime. (Tr.

_____

[9]Defendant had not been secured at this time. (Tr. 1/12/17 at 9).

7

1/12/17 at 9, 21). Defendant did not make any further statements. He never claimed the van as belonging to him.[10] (Tr. 1/12/17 at 10, 21-22).

The officer then transported Defendant back to the Archer Way intersection to have Dansby confirm that Defendant was the individual who shot him and stole the van, but Dansby had already been transported by EMS to Grady. (Tr. 1/12/17 at 10). Officer Williams, with Defendant secured in the patrol vehicle, returned to the van and conducted a search to gather evidence and due to the danger (by inference, of a firearm being in the van). (Tr. 1/12/17 at 11-12). Under the driver's seat, the officer found a loaded Rohm .22 firearm with two spent shell casings. He also found Dansby's wallet with his identification. (Tr. 1/12/17 at 12-13, 22-23).

Additional facts will be set forth as necessary during the discussion of Defendant's motions to suppress.

---

[10]Because the van did not have a tag and the officer did not find a title in the van, he was not able to confirm on scene that Dansby owned the van. However, he did so later. (Tr. 1/12/17 at 23-24).

8

## II.     Discussion

### a.     Motion to Suppress Physical Evidence

#### 1.     Stop and Search of Vehicle - Legitimate Expectation of Privacy

Defendant contends that the stop and search of the van is unlawful because Officer Williams lacked a reasonable suspicion that Defendant was engaged in criminal conduct and because no exception to the warrant requirement applied to the search. [Doc. 61 at 11-15]. Prior to discussion of Defendant's challenge to the stop and search of the van, Defendant must establish that he had a legitimate expectation of privacy in the van at the time of the search. Defendant apparently contends that he was "test driving" the van with Dansby's permission. [Id. at 8-11]. For the following reasons, the court finds that Defendant has not established a legitimate expectation of privacy in the van.

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search." United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989). It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search, that is, the van on March 23, 2015. See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000). Making this determination involves

9

a two-part inquiry: (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted). In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)). Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995).

Defendant's assertion that he was test driving the van with Dansby's permission at 3:00 a.m., on March 23, 2015, lacks any merit whatsoever. The undisputed evidence establishes, although Dansby had allowed Defendant to test drive the van earlier in the evening - or earlier in the morning - from the "bunkhouse" to the apartment complex,

with Dansby as a passenger in the van (Tr. 5/18/17 at 20-22), that Defendant subsequently refused to return Dansby's keys to him when asked to do so, demanded Dansby's wallet and, at gunpoint, ordered Dansby out of the van (Tr. 5/18/17 at 22, 26-27).  When Dansby did not immediately comply, Defendant then shot Dansby and, after Dansby exited the van, attempted to shoot him again.  (Tr. 5/18/17 at 22-23, 28-29).  No one considering this evidence would conclude that Defendant was lawfully in possession of the van with Dansby's permission.  The only reasonable conclusion is that Defendant had stolen or carjacked the van.  All of the decisions that this court has found "have held that the possessor of a stolen vehicle lacks standing to challenge a search of the vehicle." United States v. White, 504 Fed. Appx. 168, 172 (3rd Cir. 2012) (listing cases); see, e.g., United States v. Knight, 336 Fed. Appx. 900, 903 (11th Cir. 2009) (the defendant "did not establish that he had a reasonable expectation of privacy . . . with respect to the stolen car"); United States v. Stamper, 91 Fed. Appx. 445, 455-56 (6th Cir. 2004) ("Defendant has no legitimate expectation of privacy in the stolen Trans Am or its contents . . . ."); United States v. Tropiano, 50 F.3d 157, 161-62 (2nd Cir. 1995) (the court stated that "it [is] obvious that a defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car"); United States v. Lanford, 838 F.2d 1351, 1353 (5th Cir. 1988) (agreeing with other circuits

11

denying "standing to possessors of stolen automobiles"); United States v. Smith, 2009 WL 2460788, at **1-2 (S.D. Ga. August 11, 2009) (finding that possessor of stolen vehicle did not have a legitimate expectation of privacy in that vehicle); United States v. Jackson, 2005 WL 2129103, at *1 n.1 (N.D. Fla. August 31, 2005) ("Nothing was presented to establish that Defendant had lawful possession of the [stolen] truck so as to establish a legitimate expectation of privacy."). This court agrees that an individual unlawfully possessing a stolen vehicle cannot establish a legitimate expectation of privacy in that vehicle or its contents.

And Defendant does not argue that a person unlawfully in possession of a stolen vehicle has a legitimate expectation of privacy in that vehicle. His claim that he was in possession of the van with Dansby's permission is simply not supported by the evidence before the court. Under these circumstances, Defendant cannot establish an objectively reasonable expectation of privacy, that is, one that society is willing to accept, in the van. See Hastamorir, 881 F.2d at 1559. Defendant therefore cannot challenge the seizure of the firearm - or any other evidence - from the van. His motion to suppress physical evidence should be denied. Furthermore, even if Defendant could establish a reasonable expectation of privacy in the van, his motion to suppress evidence should be denied for the following reasons.

AO 72A
(Rev.8/82)

## 2. **_Terry_ Stop**

As noted, Defendant contends that Officer Williams lacked reasonable suspicion that Defendant had engaged or was engaging in criminal conduct in order to justify the stop of the van. [Doc. 61 at 11]. Defendant's argument lacks merit.

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'" United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted). Therefore, law enforcement agents may briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. See United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007). "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 88 S. Ct. at 1880); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) ("The reasonableness of the officers' conduct must be judged against an objective

13

standard: would the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate.") (citations and internal quotation marks omitted). Such brief investigatory stops do not require probable cause. See United States v. Sokolow, 109 S. Ct. 1581, 1585 (1989).

"While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Lindsey, 482 F.3d at 1290 (quoting Illinois v. Wardlow, 120 S. Ct. 673, 675-76 (2000)) (internal quotation marks omitted); see also Mikell, 102 F.3d at 475. "Also, '[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' . . . even if such activity is 'seemingly innocuous to the ordinary citizen.'" Lindsey, 482 F.3d at 1290 (citations omitted). In United States v. Smith, 201 F.3d 1317 (11th Cir. 2000), the Eleventh Circuit Court of Appeals stated, "In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention." Id. at 1323; see also Sokolow, 109 S. Ct. at 1585 (the determination as to the initial validity of the stop is based on a consideration of the totality of the

14

circumstances).  And, when considering the facts and information known to Officer Williams, the court should view all of the circumstances "in the light of the officer['s] special training and experience."  <u>Smith</u>, 201 F.3d at 1323; <u>accord</u> <u>United States v. Reed</u>, 402 Fed. Appx. 413, 415 (11th Cir. 2010) ("In making these commonsense judgments, '[t]he stopping officer is expected to assess the facts in light of his professional experience . . . .'") (citation omitted); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1221 (11th Cir. 1993) ("While none of these actions is criminal on its face, together they did provide the trained agents with reasonable suspicion" that the defendant was involved in criminal activity.).  At the point that Defendant was seized, the court must determine whether the officer's action in detaining Defendant "was justified at its inception," that is, was there a reasonable suspicion of criminal activity. <u>United States v. Acosta</u>, 363 F.3d 1141, 1144 (11th Cir. 2004) (citations and internal quotation marks omitted).

The facts establish reasonable suspicion.  At approximately 3:00 a.m., Officer Williams, traveling in a high crime area on JEB, observed a male, in a bloody white tee shirt waving at him, as he simultaneously observed a black van making a right turn onto JEB.  (Tr. 1/12/17 at 5-7, 15).  When the officer spoke to Dansby, who had apparently been shot, Dansby advised that the van observed by the officer was his, that

15

the driver of the van shot him and that his van had been stolen. (Tr. 1/12/17 at 7, 15-17; Tr. 5/18/17 at 23, 30). This information provided reasonable, articulable suspicion based on objective facts that Defendant had engaged in or was continuing to engage in criminal activity, that is, having shot Dansby and stolen - carjacked - the van. See, e.g., United States v. Smith, 318 Fed. Appx. 780, 792 (11th Cir. 2009) (finding that victim's identification of suspect as person who attacked her sufficient to supply not only reasonable suspicion but probable cause); United States v. Tolbert, 2015 WL 3505147, at *6 (N.D. Ga. June 1, 2015) (finding that eyewitness' description of suspect sufficient to establish reasonable suspicion).

Because there was reasonable suspicion to support a brief investigatory stop of Defendant, the court next considers whether the events subsequent to the initial stop were reasonably related in scope to the circumstances which justified the stop, see United States v. Hardy, 855 F.2d 753, 758 (11th Cir. 1988), or if, as Defendant contends, the officer's actions constituted an arrest.[11] When determining if an encounter constituted a *de facto* arrest, several factors should be addressed, including: the law enforcement purposes to be served by the stop, the time needed to effectuate the purposes, the law enforcement officer's diligence in pursuing the investigation, and

---

[11]This issue is relevant to Defendant's motion to suppress his statement.

the scope and intrusiveness of the detention.  See United States v. Sharpe, 105 S. Ct.

1568, 1575 (1985); Acosta, 363 F.3d at 1146 (same).  And, "the most important factor

'is whether the [officer] detained [Defendant] to pursue a method of investigation that

was likely to confirm or dispel [his] suspicions quickly, and with a minimum of

interference.'"  United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting

Hardy, 855 F.2d at 759).

In resolving this issue, "[n]o brightline test separates an investigatory stop from

an arrest.  Instead, whether a seizure has become too intrusive to be an investigatory

stop and must be considered an arrest depends on the degree of intrusion, considering

all the circumstances."  Blackman, 66 F.3d at 1576.  The fact that law enforcement

officers draw their weapons, order suspects out of their vehicles or to lie on the ground,

conduct a frisk for weapons, handcuff or secure suspects, or ask for identification does

not necessarily convert a stop into an arrest requiring probable cause.  See Acosta, 363

F.3d at 1146-47; Diaz-Lizaraza, 981 F.2d at 1221; United States v. Aldridge, 719 F.2d

368, 371 (11th Cir. 1983).  In fact, "[d]uring a lawful traffic stop, officers . . . may take

steps that are reasonably necessary to protect their personal safety . . . , including

requiring the driver and passengers to exit the vehicle 'as a matter of course.'"

17

Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 117 S. Ct. 882, 884 (1997);

Pennsylvania v. Mimms, 98 S. Ct. 330, 333-34 (1977)).

In Hastamorir, in which the officers detained a suspect by the display of firearms

and handcuffing, the court declined to find that the detention constituted an arrest and

stated, "'the use of a particular method to restrain a person's freedom of movement

does not necessarily make police action tantamount to an arrest. The inquiry . . . is

reasonableness.'" 881 F.2d at 1556-57 (quoting United States v. Kapperman, 764 F.2d

786, 790 n.4 (11th Cir. 1985)). The facts in this case establish that the officer's actions

were reasonable and undertaken to quickly investigate the circumstances leading up

to the seizure. Defendant was not under arrest during the stop and search and clearly

was not when initially stopped and detained.

Once Officer Williams was informed that Defendant shot Dansby and stole the

van, he returned to his patrol vehicle, activated his blue lights and siren and pursued

Defendant. (Tr. 1/12/17 at 7-8, 15-18). Within a quarter of a mile, Defendant stopped

the van. (Tr. 1/12/17 at 8-9, 18-19). As the officer exited his vehicle, due to the

circumstances, that is, that Defendant allegedly shot Dansby and stole the van, the

officer drew his weapon and held it at low ready, that is, aimed at the ground. (Tr.

1/12/17 at 8-9, 21). He approached the van as Defendant opened the door and started

18

to exit. (Tr. 1/12/17 at 9, 19). As the officer is allowed under these circumstances, see Spoerke, 568 F.3d at 1248, he ordered Defendant out of the van and to lie on the ground. (Tr. 1/12/17 at 9, 20; Tr. 5/18/17 at 3-4, 6). Instead of complying, Defendant responded aggressively, stating, "What the fuck did you pull me over for? I did not do anything." (Tr. 1/12/17 at 9, 19). The officer again directed Defendant to get out of the van and to lie on the ground. (Tr. 1/12/17 at 9, 20; Tr. 5/18/17 at 6). The officer had not touched Defendant nor pointed his weapon at Defendant at this point. (Tr. 1/12/17 at 9, 21; Tr. 5/18/17 at 6).

The officer's investigatory steps were also reasonable. In order to confirm that Defendant was the person who shot Dansby and stole the van, after securing Defendant, the officer transported Defendant the quarter of a mile back to Archer Way to have Dansby identify Defendant. (Tr. 1/12/17 at 10). When the officer learned that Dansby had already been transported to the hospital for treatment, he returned with Defendant to the van in order to conduct a search for evidence of the crimes reported by Dansby. (Tr. 1/12/17 at 10-12). He then searched the van. (Tr. 1/12/17 at 12, 22). All of the officer's actions were reasonable and conducted promptly to further the investigation of the crimes reported by Dansby. See Acosta, 363 F.3d at 1146. Defendant was lawfully detained and not under arrest.

19

For these reasons, the court finds that Officer Williams lawfully conducted the

Terry stop of Defendant and the black van.

### 3.    Search of Van

Defendant next contends that the warrantless search of the van was unlawful.

He focuses his argument on contending that Officer Williams was not entitled to search

the van incident to Defendant's arrest because, at the time of the search, Defendant had

been secured and was not able to access the van's interior.  [Doc. 61 at 12-15].  In

support, Defendant relies on the Supreme Court decision in Arizona v. Gant, 129 S.

Ct. 1710 (2009).  [Id.].  However, besides misinterpreting the holding in Gant,

Defendant also mistakenly appears to argue that pursuant to Gant, the automobile

exception to the warrant requirement does not apply because Defendant was in custody

and the van secured.[12]  [Id.].  Due to the finding that the automobile exception justifies

---

[12]In Gant, the Court held that the decision in Chimel v. California, 89 S. Ct. 2034 (1969), upon which the search incident to arrest exception is originally based, "authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Gant, 129 S. Ct. at 1719.  The Court *also held* that, although not following from Chimel, "circumstances unique to the vehicle context justify a search incident to a lawful arrest[, even though the arrestee is secured away from the vehicle,] when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" Id. (quoting Thornton v. United States, 124 S. Ct. 2127, 2127 (2004)).  Elaborating on this aspect of the exception, the Court stated, "In many cases, as when a recent occupant is arrested for a traffic violation, there will be

the warrantless search of the van, the court will not address in detail whether the search was lawfully conducted incident to Defendant's arrest.

Although as a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search, see California v. Carney, 105 S. Ct. 2066, 2069 (1985), in Carroll v. United States, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles. Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996); see also United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006) (indicating that "readily mobile" means "operational"). No separate exigent

---

no reasonable basis to believe the vehicle contains relevant evidence. . . . But in others, including [New York v. ]Belton[, 101 S. Ct. 2860 (1981)] and Thornton, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any contents therein." Id.; accord United States v. Lightbourn, 357 Fed. Appx. 259, 264 (11th Cir. 2009) ("If the offense of arrest supplies a basis for a search incident to arrest[, such as a firearm offense], the officer may search 'the passenger compartment of an arrestee's vehicle and any containers therein.'") (citation omitted). Defendant's offenses, shooting Dansby and carjacking the van, would fall under the second part of Gant. Although the delay in conducting a search under Gant is not without limitations, see United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003); United States v. Gomez, 807 F. Supp. 2d 1134, 1143, 1148-49 (S.D. Fla. 2011), arguably the search in this case was conducted promptly enough to satisfy Gant.

AO 72A
(Rev.8/82)

circumstances need to be shown.  See Maryland v. Dyson, 119 S. Ct. 2013, 2014

(1999); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court

made it clear that the requirement of exigent circumstances is satisfied by the ready

mobility *inherent* in all automobiles that reasonably appear to be capable of

functioning.") (quoting United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990))

(internal quotation marks omitted; emphasis in original).[13]  There is no dispute that the

van was mobile.

      The validity of the search, accordingly, turns on whether there was probable

cause to believe the van contained contraband or evidence of a crime.  Dyson, 119 S.

Ct. at 2014; see also Lindsey, 482 F.3d at 1293 ("The key issue here is whether the

police had probable cause for the search and seizure of the vehicle.").  "Probable cause

for a search exists when under the totality of the circumstances there is a fair

probability that contraband or evidence of a crime will be found in a particular place."

United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal

quotation marks omitted).  Based on the totality of the circumstances known to Officer

---

[13]Contrary to Defendant's argument, there is no requirement that the search
occur contemporaneously with the vehicle's seizure.  See United States v. Johns, 105
S. Ct. 881, 885 (1985); Lindsey, 482 F.3d at 1293; United States v. Weber, 808 F.2d
1422, 1425 (11th Cir. 1987).

AO 72A
(Rev.8/82)

Williams, the court finds that there was probable cause to believe that evidence relating to the shooting of Dansby and/or the theft of the van would be found in the vehicle.

As previously set forth, as the officer observed the van turning onto JEB from Archer Way, he observed Dansby, in a bloody white tee shirt at the same intersection. (Tr. 1/12/17 at 6-7, 15). Dansby advised that the man driving the van, which was his, had shot him and stolen his van. (Tr. 1/12/17 at 7, 15-17; Tr. 5/18/17 at 23, 30). This information provided probable cause to search the van for evidence, particularly for the firearm used in the carjacking. See Smith, 318 Fed. Appx. at 792. And Defendant's conduct when stopped heightened the officer's basis for believing Defendant was involved in criminal activity. Defendant initially refused to comply with the officer's instruction to exit the van and lie on the ground; instead, he aggressively confronted the officer by demanding, "What the fuck did you pull me over for? I did not do anything." (Tr. 1/12/17 at 9, 19-20; Tr. 5/18/17 at 6). The totality of the circumstances support a finding that there was probable cause to believe evidence would be found in the van.

During the search of the passenger compartment of the van, under the driver's seat, the officer found a Rohm .22 firearm, with two spent shell casings. He also found

23

Dansby's wallet and identification. (Tr. 1/12/17 at 11-13, 22). The officer lawfully searched the van pursuant to the automobile exception to the warrant requirement.

### 4.    Conclusion

For these reasons, the court recommends that Defendant's motion [Doc. 20] to suppress physical evidence be denied.

### b.    Motion to Suppress Statement

Defendant also moves to suppress his statement, "What the fuck did you pull me over for? I did not do anything." (Tr. 1/12/17 at 9), contending, first, that it constitutes fruits of the allegedly unlawful stop and detention, and second, that he was in custody and made the statement before being advised of his Miranda rights. [Doc. 61 at 16]. As discussed *supra*, Defendant's first ground for suppression fails because the stop of the van and his detention was lawful. And, as the Government argues, Defendant's alternative ground for suppression fails because, as already determined, he was not in custody when he made the statement, and in fact, his statement was spontaneous and voluntary. [Doc. 62 at 12-15].

In Miranda v. Arizona, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be

24

warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 114 S. Ct. 1526, 1528 (1994) (quoting Miranda, 86 S. Ct. at 1612). The Supreme Court recently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010). The Court stated, "We have declined to accord it 'talismanic power,' because Miranda is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" Id. (quoting Berkemer v. McCarty, 104 S. Ct. 3138, 3148-49 (1984)). Accordingly, "[a]n officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" Stansbury, 114 S. Ct. at 1528 (quoting Oregon v. Mathiason, 97 S. Ct. 711, 714 (1977) (per curiam)); accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person

being questioned."[14] Stansbury, 114 S. Ct. at 1529; accord United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same). "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

The circumstances before the court fall outside "the Miranda paradigm[,]" United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010), that is, interrogation of a suspect at the police station, or similar circumstances establishing the functional equivalent of an arrest requiring Miranda warnings. While Defendant was clearly detained during the stop, as already determined by the court, the detention was not a *de facto* arrest requiring Miranda warnings. Defendant mistakes being detained or not free to leave [Doc. 61 at 16] with the level of custody necessary to trigger Miranda

---

[14]While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" Stansbury, 114 S. Ct. at 1529-30, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted).

26

warnings, which was not reached in this case. Applying the test set forth in <u>Shatzer</u> to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .
>
> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted; emphasis in original).

And in <u>Acosta</u>, 363 F.3d 1141, the Eleventh Circuit Court of Appeals refused to find that the defendant was subjected to a custodial interrogation during a <u>Terry</u> stop. The court noted that the stop occurred in a parking lot of an apartment complex in broad daylight making the officers' actions visible to anyone in the area. Although weapons were initially drawn, at the time that the defendant was questioned, all the weapons were holstered. The defendant's driver's license and car keys appear to have been in the officers' possession during the stop, and he was prevented from entering

his vehicle on at least one occasion. Id. at 1147. As was true in Acosta, in the instant case:

> The stop did not involve the type of "highly intrusive" coercive atmosphere that may require Miranda warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in [Defendant North's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No Miranda warnings were required at the time.

Id. at 1150; see also United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (finding that statements made during a Terry stop were admissible, the court noted that "we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes").

In summary, in the case before the court, no facts support a finding that Defendant's "'freedom of action to have been curtailed *to a degree associated with formal arrest.*'" Luna-Encinas, 603 F.3d at 881 (citations omitted; emphasis in original). Defendant was not in custody requiring that he be advised of his Miranda rights at the time he made the challenged statement. And the statement was not made in response to interrogation.

28

As the record establishes, when Officer Williams approached Defendant and directed that he exit the van and lie on the ground, instead of complying, Defendant stated, "What the fuck did you pull me over for? I did not do anything." (Tr. 1/12/17 at 9). The officer was not seeking any verbal response from Defendant, and no verbal response was required. The statement is admissible as a spontaneous and volunteered statement that was not the result of interrogation or the functional equivalent of interrogation.[15] See Rhode Island v. Innis, 100 S. Ct. 1682, 1689-90 (1980); United States v. Sanders, 315 Fed. Appx. 819, 823 (11th Cir. 2009) ("'Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning.'") (quoting Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991)); United States v. Hendrieth, 922 F.2d 748, 751 (11th Cir. 1991) ("When a defendant deliberately chooses to initiate or continue a conversation, . . . the statements violate neither the Fifth Amendment right against self-incrimination nor the Sixth Amendment right to counsel.") (citations omitted). "[B]asic directives of the kind often attendant to arrest and custody[,] such as commands directing defendant to sit down, take off his hat, and not retrieve his

---

[15]The circumstances surrounding Defendant's statement are set forth more fully in the discussion *supra*.

29

belongings, were not the functional equivalent of interrogation[.]" <u>United States v.</u> <u>Wilson</u>, 100 F. Supp. 3d 268, 282 (E.D. N.Y. 2015) (citation and internal quotation marks omitted); <u>and see</u> <u>United States v. Anderson</u>, 2017 WL 3172762, at **2-3 (D. Minn. June 22, 2017) ("declarative commands such as 'stop the vehicle' and 'get out of the vehicle' made in the performance of an apprehension were not the functional equivalent of interrogation[;] . . . [r]ather, such commands are clearly declarative; they order actions by Defendant and they were intended solely and exclusively to effectuate the task of taking Defendant into custody"), <u>report and recommendation adopted by</u>, 2017 WL 3168958 (D. Minn. July 25, 2017).

For these reasons, the court recommends that Defendant's motion [Doc. 21] to suppress his statement be denied.

## III. Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant North's motions [Docs. 20 and 21] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

AO 72A
(Rev.8/82)

**SO ORDERED AND RECOMMENDED** this 8th day of August, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)